# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

KAROLYN EASTMAN,

       Plaintiff,


v.                                                  **MEMORANDUM OF LAW & ORDER**
                              Civil File No. 06-4123 (MJD/RLE)


THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

       Defendant.

_____

Mark G. Schneider, Mark G. Schneider, PLLC, and Paul R. Oppegard, Smith
Bakke Oppegard Porsborg Wolf, Counsel for Plaintiff.

Edna S. Bailey, Wilson Elser Moskowitz Edelman & Dicker, and Patrick H.
O'Neill, Jr., O'Neill & Murphy, LLP, Counsel for Defendant.

_____

## I.      INTRODUCTION

This matter is before the Court on the parties' cross-motions for summary

judgment.  [Docket Nos. 25, 29]  Also before the Court is Defendant's Motion to

Strike Portions of Plaintiff's Reply Brief in Support of Her Motion for Summary

Judgment or, Alternatively, for Leave to File a Sur-Reply.  [Docket No. 48]  The

Court heard oral argument on November 9, 2007.

## II.     BACKGROUND

**A.     General Background**

Plaintiff Karolyn Eastman was employed from January 24, 1994, until

August 2, 2002, as a Senior Engineering Project Leader with Polaris Industries,

Inc. ("Polaris") in Roseau, Minnesota.  (Administrative Record ("AR") 1050-51.)

As part of her employment with Polaris, Plaintiff was provided long term

disability ("LTD") coverage as part of an ERISA-governed Employee Welfare

Benefits Plan (the "Policy").  Defendant The Prudential Insurance Company of

America ("Prudential") underwrote Plaintiff's LTD coverage pursuant to the

terms of Policy. (AR 17-58)  Polaris was the Plan sponsor and Plan administrator.

(Id. 51.)  Prudential was the claims administrator and supplier of Plan benefits.

(Id. 52.)

**B.     The LTD Policy**

Under the terms of the LTD Policy, Defendant, as claims administrator,

"has the sole discretion to interpret the terms of the Group Contract, to make

factual findings, and to determine eligibility for benefits.  The decision of the

Claims Administrator shall not be overturned unless arbitrary and capricious."

(AR 52.)  Under the Policy, a claimant is disabled when

- you are unable to perform the ***material and substantial duties*** of
  your ***regular occupation*** due to ***sickness*** or ***injury***; and

- you have a 20% or more loss in your ***indexed monthly earnings*** due
  to that ***sickness*** or ***injury***.

> After 24 months of payment, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any *gainful occupation* for which you are reasonably fitted by education, training, or experience.

(AR 27.)  Under the Policy, Eastman was required to provide proof of claim, including "[t]he date your disability began;" "[a]ppropriate documentation of the disabling disorder;" and "[t]he extent of your disability, including restrictions and limitations preventing you from performing your regular occupation or gainful occupation."  (<u>Id.</u> 41.)  In addition, the Policy contains the following limitation:

> Disabilities which, as determined by Prudential, are due in whole or part to *mental illness* have a limited pay period during your lifetime.
>
> The limited period for mental illness is 24 months during your lifetime.

(AR 36.)  Mental illness is defined as follows:

> *Mental illness* means a psychiatric or psychological condition regardless of cause.  Mental illness includes but is not limited to schizophrenia, depression, manic depressive or bipolar illness, anxiety, somatization, substance related disorders and/or adjustment disorders or other conditions.  These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs or other similar methods of treatment as standardly accepted in the practice of medicine.

(<u>Id.</u>)

Finally, the Policy affords Defendant the right to recover overpayments

due to receipt of deductible sources of income by the insured, such as disability

payments under the Social Security Act.  (AR 31, 42.)

C.     **Plaintiff's Illness and Her Policy's Coverage**

1.     **Prudential's Initial Approval of Eastman's LTD Claim**

Beginning on August 2, 2002, Eastman began receiving short term

disability ("STD") benefits, which lasted six months.  (AR 89-90.)

On February 5, 2003, Plaintiff applied for LTD benefits through Prudential.

(AR 1033-54.)  Plaintiff's claim submission was supported by an Attending

Physician's Statement completed by her primary care physician, Dr. Ralph

Herseth, M.D.  (Id. 1041-43.)  Herseth diagnosed Plaintiff with major depression,

generalized anxiety disorder, and multiple physical symptoms secondary to her

mental disorders, including cognitive function difficulty, extreme fatigue,

multiple areas of myalgia, and severe insomnia.  (Id. 1041, 1043.)  Herseth opined

that Eastman retained medium level functional capacity.  (Id. 1041.)

On March 6, 2003, Herseth recorded his impression that Eastman suffered

from "1. Major depression. 2. Panic disorder with agoraphobia. 3. Fibromyalgia"

and opined, "I think the component of fibromyalgia in this lady is a big factor; it

seems to really be disabling her."  (AR 931.)

On April 3, 2003, Josephine Malysz, RN, a psychiatric nurse, conducted a

clinical psychiatric review of Eastman's file for Prudential.  (AR 62-63.)  In her

analysis, Malysz found, in pertinent part:

> A review of above documentation reveals the clmt experiencing
> multiple stressors including Father/dementia, mother/serious illness,
> new marriage, hx of severe domestic violence in previous marriage,
> multiple health problems and a heavy work load when she
> experienced an incident a[t] work that resulted in back pain and
> caused [claimant to be out of work]. The clmt attempted a part time
> rtw but was not able to handle it.
>
> * * *
>
> Both Dr. Herseth's recent notes and the recent ov notes from the
> therapist indicate the clmt has made progress in her psychiatric
> condition and she is beginning to stabilize, the clmt con't to
> experience physical problems including fibromyalgia*which will
> need further review by the clinical team.
>
> * * *
>
> As of 2/02 the therapist notes indicate sleeping better, anxiety/panic
> symptoms are decreasing in intensity/frequency.  Dr. Herseth[']s
> 3/03 ov notes improvement in sleep, forgetting things, main
> complaint is aching/fibromyalgia component is big factor in
> disabling her.
>
> It appears due to multiple psychiatric sxs the clmt was not able to
> rtw but it appears she is beginning to improve.

(AR 62-63.)

On April 4, 2003, Defendant approved Plaintiff's disability claim, effective

January 29, 2003.  (AR 64, 151-152.)  Chastity Mallory, the claim manager,

approved the disability claim, because "EE meets def. of TD at this time due to

psych condition therefore will approve LTD through 5/31/03 and f/u w/EE that

begins to receive appropriate care w/psychiatrist."  (AR 64.)  She also noted,

"Will also f/u PE findings to determine if supports TD for EE's physical

complaints of fibromyalgia."  (Id.)

On June 3, 2003, Eastman asked Herseth to test for fibromyalgia because

"[h]er concern is that her disability covers her for 2 years for depression, but it

covers her until age 64 for fibromyalgia."  (AR 910.)  Herseth opined, "I am

hoping that by the time 2 years have gone by, she has now only been in the long

term disability for 3 months, that a lot of these issues have resolved."  (Id.)

Herseth wrote,  "She truly has not had symptoms that would warrant a complete

workup, but I have agreed to go ahead and test it."  (AR 910.)

### 2.     First Termination and Reinstatement of Eastman's Benefits

On September 22, 2003, Mary Ann DeSantis, RN, conducted a follow-up

review of Plaintiff's file and concluded that the intensity of her psychiatric

treatment did not reflect a significant psychiatric disorder.  (AR 66.)  DeSantis

continued, "However, as fibromyalgia has a strong psych component, would

obtain 8/15/03 OV note and beyond from Dr Hussain, and Brenda[] King's OV

notes, and return to clinician for continued psych review."  As for the possibility

of fibromyalgia, DeSantis opined, "Unless clmt has a rheumatologic disorder

which needs tx, it does not appear she would remain impaired due to

fibromyalgia.  Clmt is to see rheumatologist Dr Lessard 9/29/03 (initially, appt

was 9/04/03) and we should wait for report of that eval to complete fibromyalgia

review." (<u>Id.</u>)

On September 29, 2003, James A. Lessard, M.D., conducted a rheumatology consultation on Eastman. (AR 458-63.) Lessard's impression was "[f]ibromyalgia – this is undoubtedly the cause of her current aches and pains, probably caused by if not aggravated by [her history of depression and anxiety, and also the panic attacks.]" (AR 462-63). He noted that "all" of Eastman's "tender points" had a "3 to 4+ with a positive jump sign." (AR 462.)

By letter dated October 30, 2003, Defendant terminated Plaintiff's LTD benefits effective November 1, 2003, based on an "absence of any medical documentation to support an impairment from your regular job duties due to fibromyalgia or depression." (AR 142-144.)

Plaintiff, through counsel, submitted an appeal of Prudential's decision on December 31, 2003. (AR 810-15.) The request was based on the assertion that Eastman was disabled "because of the combination of her depression/anxiety and fibromyalgia" and stated that the trigger point test constituted objective evidence of impairment by fibromyalgia; however, the appeal letter focused on evidence of Eastman's disability due to mental illness. (<u>Id.</u> 813.) For example, the appeal noted that on November 21, 2003, Herseth opined, "I do feel this lady has major depression with anxiety and she has fibromyalgia, which is maybe secondary; the **depression is definitely overwhelming**." (<u>Id.</u> (emphasis added in appeal letter).)

On January 15, 2004, Defendant referred Eastman's file to psychiatric consultant, psychiatrist Dr. Stephen Gerson, M.D., for analysis.  (AR 69, 701-21.) Gerson contacted Eastman's treating psychiatrist, Dr. Shakeeb Hussain, M.D., on February 17, 2004.  (AR 722-23, 728.)  Hussain had treated Eastman since April 29, 2003.  (Id. 722.)  Hussain opined that Eastman was able to return to work part-time and had been able to do so for the previous couple of months; however, he also opined that Eastman should receive electroshock therapy and intensive psychotherapy.  (Id.)  Hussain also indicated that Eastman's depression and stressors, such as the death of Eastman's father, made her fibromyalgia worse. (Id.)  (However, in a letter to Hussain summarizing their conversation, Gerson states that Hussain opined "that fibromyalgia made the depression worse."  (Id. 728.))

Gerson also contacted Dr. Brenda King, Ph.D., Eastman's treating therapist who had treated Eastman since February 24, 2003.  (AR 724-25.)  King opined that Eastman was disabled from performing her occupation due to depression and ongoing psychiatric impairment.  (Id. 724, 726.)

In his February 15, 2004, report, Gerson opined that Plaintiff was impaired from her position as a result of her psychiatric conditions and might be impaired indefinitely unless she received more aggressive treatment.  (AR 702-21).  Gerson reviewed and analyzed medical records from Dr. Harold E. Randall, Ph.D.,

8

Eastman's psychologist from October 22, 2002 through February 27, 2003, when

treatment was transitioned to King; Lessard; Herseth; and King.  Gerson also

addressed the question of whether Eastman's psychiatric condition was

impacting her fibromyalgia:

> Yes . . . note Dr. Herseth and Psych providers in his note of 3/28/03
> felt there was an interplay, alleged fibro pain making psych
> symptoms worse.  Moreover, medical records seemed to indicate
> that the claimant's perception of pain and discomfort was
> heightened in concert with subjective reports of stress intolerance,
> increased sleep disturbance and increased anxiety symptoms.

(AR 721.)

On March 1, 2004, based on Gerson's assessment, Defendant reinstated

Plaintiff's disability benefits effective November 1, 2003, based on psychiatric

impairment.  (AR 70, 136-37.)  The reinstatement letter recounted the 24-month

mental illness limitation in the policy.  (Id. 137.)

### 3.    Social Security Disability Benefits

On May 28, 2004,  Herseth completed a Treating Physician Medical

Opinion Statement, in conjunction with Eastman's application for Social Security

disability benefits.  (AR 607-13.)  Herseth noted that Eastman's diagnosis was

major depression and fibromyalgia (id. 607) and opined that Eastman could not

work at even a sedentary level because her "mental status would not allow" (id.

611).  He also noted that, with regard to her "exertional limitations" Eastman

"develops fatigue increase with most activity" and, with regard to "postural

limitations," she "can do all these functions physically but tolerance is not there."

(Id. 607-09.)

On October 27, 2004,  Plaintiff was approved for social security disability

benefits ("SSDB"), with a disability onset date of August 1, 2002.  (AR 594-601.)

The Social Security Administrative Law Judge ("ALJ") held that Plaintiff was

disabled under the Social Security Act.  (Id. 601.)  Eastman had claimed disability

based on "fibromyalgia, depression and anxiety."  (Id. 598.)  The ALJ found that

"[t]he medical evidence establishes that the claimant has severe depression,

anxiety, and fibromyalgia."  (Id. 600.)  However, when discussing the medical

evidence and Eastman's limitations, the ALJ only discussed Eastman's mental

illnesses.  The ALJ opined that "[t]he medical records well document claimant's

history of depression and anxiety, with increasing difficulty leaving the home."

(Id. 599.)  The ALJ discussed records from King and Herseth, noting that Herseth

opined that "claimant's mental status would not allow the performance of full-

time work."  (Id.)  With respect to Plaintiff's impairment, the ALJ stated:

> While the specific limitations appear to be somewhat out of
> proportion of the medical records, the undersigned generally accepts
> the opinion of claimant's treating professionals and accepts that
> claimant's depression and anxiety result in marked difficulties in
> maintaining concentration, persistence or pace and precludes the
> performance of even simple, repetitive tasks involving more than
> brief or superficial contact with others on a sustained basis.

Claimant cannot be expected to sustain the mental demands of work eight hours per day, five days per week or the equivalent thereof. Claimant would need more breaks, more days off than are normally afforded in the work place and is not considered to be vocationally reliable given the severity of her mental impairments.

Accordingly, claimant cannot be expected to perform her past relevant work or any other work existing in significant numbers in the national economy pursuant to Social Security Ruling 96-8p, and is disabled within the meaning of the Social Security Act.

(AR 599.)  The ALJ's finding of disability is based on Eastman's mental illnesses.

### 4.   Termination of Benefits Due to Mental Illness Limitation

Herseth completed a follow-up Attending Physician Statement for Prudential on December 8, 2004, stating that Eastman was not able to return to work because of her "mental function" and stated that the "Nature of Medical Impairment (i.e., loss of function)" was severe depression.  (AR 662-63.)

On January 25, 2005, Defendant applied the Policy's 24-month mental illness limitation and terminated Plaintiff's LTD benefits effective  January 29, 2005.  (AR 127-129.)  The termination letter explained, "Since your diagnosis of Major Depressive Disorder is considered a psychiatric illness[], you are entitled to 24 months of LTD benefits."  (Id. 128.)

On July 21, 2005, Plaintiff appealed the termination, claiming that she "suffers from severe and debilitating fibromyalgia which renders her disabled. This is without taking into consideration her depression/anxiety."  (AR 553-57.)

On May 13, 2005, Herseth responded to a questionnaire from Plaintiff's counsel regarding her fibromyalgia condition.  (AR 385-87)  Herseth opined that "objective signs/symptoms in Ms. Eastman's case substantiate the diagnosis of fibromyalgia."  (Id. 385-86.)  He noted that "[f]ibromyalgia does not qualify as a mental illness."  (Id. 386.)  With respect to Plaintiff's continuing complaint of fatigue, Herseth stated, "I guess I do not see that as being [a] symptom related to fibromyalgia alone.  Certainly the symptom of fatigue is a primary, or commonly found, symptom[] relating to depression and the extreme fatigue that [Plaintiff] experiences I would attribute more to depression than to fibromyalgia." (Id.)  With respect to Plaintiff's symptom of pain, Herseth stated, "Severe pain is certainly the most common symptom [] of fibromyalgia, and I do contribute [Eastman's] symptoms of pain to fibromyalgia.  I do not see that as a symptom of depression." (Id.)  Herseth opined

> At the time I filled this questionnaire out I did feel that her mental status certainly was limiting basically any of her abilities as far as being gainfully employed.  It would be my feeling that if you[] were going to try to make a decision whether the fibromyalgia was physically limiting her at this point, it might be wise to have functional capacities assessment done as that is certainly a much better assessment of physical disability.  I do not feel that I could make a determination of her disability based on physical findings alone.

(Id.)  Also, "Eastman's complaints of disabling pain and fatigue traceable to her fibromyalgia condition [are] credible and based on medical evidence."  (Id.)  He

also stated that he did "not feel [Eastman's] fatigue is related solely to her

fibromyalgia condition," but "[c]ertainly her fatigue has been severe at times and

I do feel has prevented her from engaging in any regular employment." (Id.)

With respect to the interrelationship of depression and fibromyalgia, Herseth

stated:

> I do feel, regardless of the c[ause] and effect on relationship between
> fibromyalgia and depression, that she is incapable of anything other
> than intermittent 'as tolerate' employment.  Unfortunately, I don't
> think you can separate these things out clearly enough so that you
> can say one alone causes this situation to be.

(AR 386-87.)  Finally, Herseth opined that there was no evidence that Eastman

"has been 'malingering' or in any way seeking any type of secondary gain

regarding her illnesses." (Id. 387.)

On July 20, 2005, Herseth provided another letter to Eastman's counsel.

(AR 388.)  He again opined that he could not separate the symptoms from her

fibromyalgia and her depression.  (Id.)  He concluded, "Overall I feel, in the last

few months, her depression has been fairly stable.  It appears that her

fibromyalgia is what waxes and wanes and it appears to be related somewhat to

her level of activity." (Id.)

Herseth referred Eastman to Step Ahead Therapy where she received

physical therapy for her fibromyalgia between August 8, 2005, and October 31,

2005.  (AR 263.)  Her treatments included myofascial release. (Id.)

Prudential referred Plaintiff's file and appeal to Dr. Joel M. Shavell, D.O., a

rheumatologist, for independent analysis and assessment of Plaintiff's level of

function with respect to fibromyalgia.  (AR 72, 123-24.)  On August 22, 2005,

Shavell provided his opinion based on his assessment of Eastman's file, including

records from her counsel, Herseth, Randall, King, Hussain, Lessard, and Drs.

Tsibulsky, Anderson, and Thompson who conducted Northwestern Psychiatry

and Mayo Clinic psychiatry evaluations.  (Id. 269-72.)

Shavell stated that

> there is no evidence of any physical findings that limit her from any
> of her work-related activity. . . .   The complaint that she seemed to
> have was pain in the shoulders and the elbows and the hips, which
> was diagnosed as fibromyalgia, but there was no evidence
> throughout the entire chart of any abnormal physical findings,
> limitation of motion, inability to function on a physical basis, or any
> long-term organic disease that would require her to be off work.

(Id. 271.)  He noted that the consensus of her treating physicians was that she

predominantly suffered from panic disorder, agoraphobia, and major depression,

and when she lost control, experienced increased anxiety, resulting in pain and

medical problems.  (Id.)  As to her mental illnesses, Shavell thought that Eastman

"was well evaluated and undertreated."  (Id.)

Shavell opined that Eastman

> is not impaired from any physical point of view whatsoever.  In
> reviewing the charts and reviewing the information that was given
> to me, none of the physicians have ever made an attempt or thought

about making an attempt to establish a physical limitation of this claimant.  There are no reports of physical limitation, or limitation of motion of the joints.  There are no physical reports of limitations of muscle strength or range of muscle strength.  There is absolutely nothing to indicate that she has any severe physical disabilities which would entail that she not work.  All of the opinion was rendered with evaluations and very little treatment.  No laboratories studies defined it, and no x-rays defined it, including doctor's notes and no treatments defined any limitation or any organic disease whatsoever.  After review of the medical records, it is my opinion that she is able to return back to her normal work activities in a full time capacity without any restrictions.

(AR 272.)

On August 31, 2005, Defendant upheld its decision to terminate Plaintiff's benefits, because Plaintiff had exhausted her benefits for mental illness-based disability and had no physical limitations preventing her from returning to work independent of her psychiatric conditions.  (AR 118-21.)  Prudential's letter acknowledged that Eastman was diagnosed with fibromyalgia but further asserted that her medical file contained "no mention of any abnormal physical findings, limited motion or an inability to function on a physical basis.  There are no physical reports of limitation on muscle strength or range of muscle strength.  The documentation in file does not support an impairment that would prevent Ms. Eastman from performing her regular occupation with any restrictions."  (Id. 119-20.)  Prudential further stated that "[a]lthough her doctors are indicating she has fibromyalgia, her symptoms appear to be due, in whole or part, to her

underlying mental illness for which she has exhausted all benefits payable due to

the Group Policy Benefit Limitation." (Id. 120.)

### 5.    Eastman's Second Request for Reconsideration

On December 6, 2005, Plaintiff saw another rheumatologist, Dr. James F.

Hatch, M.D.  (AR 255-59.)  Hatch concluded that "[f]ibromyalgia is clearly

present but the majority of her aches and pains that really bother her are not due

to fibromyalgia, i.e. bilateral trochanteric bursitis of the hips and bilateral plantar

fascitis." (Id. 257.)  Hatch's notes provide, "The patient was advised that

fibromyalgia does not have to be a chronic disease and that as far as I thought she

should be able to correct the above problems as suggested." (Id. 257-58.)

On February 22, 2006, Eastman submitted a second appeal of Prudential's

termination and included Hatch's report.  (AR 260-64.)

Defendant requested an external file review from a physical medicine and

rehabilitation specialist, Dr. April Campbell, M.D.  (AR 78.)  On March 26, 2006,

Campbell provided a seven-page analysis.  (AR 176-82.)  She reviewed records

from Herseth, King, Randall, Hussain, Gerson, Tsibulsky, Anderson, Thompson,

Hatch, and Shavell, among others. (Id.)  She specifically discussed records from

Herseth, Hussain, Lessard, and Hatch.

Campbell opined that while Eastman was disabled by "severe mental

illness," she was not disabled by fibromyalgia.  (AR 182.)  Campbell concluded

16

that "[t]he fibromyalgia is clearly a secondary issue, and in fact, I rather doubt

that she has true fibromyalgia."  (Id.)  She concluded that

> [t]here is no evidence of any functional impairments involving Ms.
> Eastman.  She has consistently had a normal musculoskeletal exam,
> and all of her complaints have been subjective in nature.  There have
> been virtually no objective findings, either on physical exam or on
> imaging studies, to indicate evidence of ongoing pathology.  The
> tender point examination for fibromyalgia is considered subjective
> testing, since it relies on the claimant to give a subjective complaint
> of pain.

(AR 180.)  She opined that Plaintiff's continuing reports of chronic pain "could be

consistent with malingering and/or efforts at obtaining secondary gain,"

particularly in light of the fact that Eastman began complaining of more pain

when she became concerned that her LTD for her psychiatric claim would be

discontinued after two years.  (Id. 181.)  Campbell also opined that

"[f]ibromyalgia as a disease entity continues to be a controversial one.  The

diagnosis is based entirely on subjective symptoms that anyone can replicate, and

in the absence of any objective findings, I feel that Ms. Eastman could return to

the essential duties of her job, or any occupation from a musculoskeletal point of

view."  (Id. 182.)

In a letter dated April 14, 2006, Defendant upheld its termination of

Plaintiff's LTD benefits on the grounds that, aside from her psychiatric illness,

the records did not support any other disabling condition.  (AR 79-80, 109-13.)

The letter recounted Eastman's medical records, including a discussion of Hatch's treatment. Defendant stated: "Our review of the file indicated that the medical records did not support the presence of a medical impairment at any time after January 29, 2005. Further, Ms. Eastman would not be eligible for benefit payments for any subsequent medical conditions, including the conditions noted by Dr. Hatch as of February 2006, as her coverage under the policy had lapsed." (Id. 112.) Defendant concluded, "After reviewing Ms. Eastman's medical records, we maintain that documentation does not support a physical impairment that would preclude her from returning to work. In the absence of medical evidence to document a non-psychiatric impairment that would preclude Ms. Eastman from working as of January 29, 2005, we are unable to pay additional benefits." (Id.)

### 6. Overpayment of Benefits

Starting in April 2006, Defendant also began its attempts to collect overpayments based on Plaintiff's retroactive receipt of SSDB, as provided in the Policy and in the Reimbursement Agreement signed by Eastman on April 15, 2003. Prudential computed overpayment in the amount of $27,189.68. (AR 76-77, 81-87, 103-06, 164-71, 579-81.)

### D. Procedural History

On October 12, 2006, Eastman filed a Complaint against Prudential in this

Court, requesting reinstatement of her LTD benefits from January 29, 2005,

forward.  Defendant filed a counterclaim for breach of contract requesting that

Eastman repay overpayment of her disability benefits because Prudential is

entitled to reimbursement for the amounts paid by the Social Security

Administration for the period of January 29, 2003, through January 29, 2005.

Both parties have now moved for summary judgment.

Prudential has also moved to strike portions of Eastman's reply brief or, in

the alternative, for leave to file a sur-reply.  [Docket No. 48]  Eastman opposes

this motion.  [Docket No. 52]  Although the Court finds nothing improper in

Eastman's reply, it will permit Prudential to file its sur-reply in order to ensure

that the parties' positions are fully expressed to the Court.

III.   DISCUSSION

A.      Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate

when "there is no dispute of fact and where there exists only one conclusion."

Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.    Standard of Review for of Prudential's Decision

#### 1.    General Standard of Review

Under ERISA, a plan beneficiary has the right to judicial review of a

benefits determination.  See 29 U.S.C. § 1132(a)(1)(B).  When a policy provides the

plan administrator with discretionary authority to determine eligibility for

benefits, the abuse of discretion standard generally applies.  Cash v. Wal-Mart

Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997).  Here, Plaintiff does not

dispute that the Policy grants Defendant discretionary authority to determine her

eligibility for LTD benefits.

Under the abuse of discretion standard, the plan administrator's decision

to deny benefits must be affirmed if "a reasonable person could have reached a

similar decision, given the evidence before him, not that a reasonable person

would have reached that decision."  Clapp v. Citibank, N.A. Disability Plan, 262

F.3d 820, 828 (8th Cir. 2001) (emphasis in original) (quotation omitted).  Review

of the administrator's decision is limited to the administrative record that was

before the plan administrator at the time that the final benefits decision was

made.  Cash, 107 F.3d at 642.  A decision is reasonable if it is supported by

substantial evidence, meaning "more than a scintilla but less than a

preponderance."  Clapp, 262 F.3d at 828 (citation omitted).  A court "will not

disturb a decision supported by a reasonable explanation even though a different reasonable interpretation could have been made." Id. (citation omitted).

"To obtain a less deferential review, [a plaintiff] must present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." Woo v. Deluxe Corp., 144 F3.d 1157, 1160 (8th Cir. 1998) (citation omitted.)  The conflict or procedural irregularity must have must be egregious enough to create "a total lack of faith in the integrity of the decision-making process." Layes v. Mead Corp., 132 F.3d 1246, 1251 (8th Cir. 1998) (citation omitted).  If the claimant meets both prongs of the Woo test, including a showing "that the conflict or irregularity has some connection to the substantive decision reached," the Court will adjust the deference given to the decision of the plan administrator, depending on the seriousness of the conflict or irregularity.  Woo, 144 F.3d at 1161-62 (citation omitted).

## 2.    Analysis of Applicable Standard of Review

Eastman contends that the Court should review the Prudential's decision to deny her coverage de novo, because Prudential has a palpable conflict of interest and committed four serious procedural irregularities when reviewing her claim.

### a.   Structural Conflict of Interest

Eastman asserts that Prudential has a conflict of interest because, as the plan insurer,  it will receive a direct financial benefit from denying her claim. Even though Defendant acted as both claims administrator and the entity that supplies plan benefits, this fact alone is not enough to warrant heightened review.  <u>Chronister v. Baptist Health</u>, 442 F.3d 648, 655 (8th Cir. 2006).  Eastman cannot satisfy the second prong of the test on this basis because she has not shown that Prudential's "initial grant and later termination of [Eastman]'s disability benefits were tainted by any financial impact that those decisions may have had on [Prudential] as the plan-funding insurer."  <u>Id.</u>

The Court holds that there is no structural conflict of interest warranting a heightened standard of review.  However, the Court must still examine whether Eastman meets the first prong of the <u>Woo</u> test due to the existence of procedural irregularities.

### b.   Serious Procedural Irregularities

### i.   Whether Prudential Ignored Objective Findings of Fibromyalgia

In Prudential's October 30, 2003, termination letter, in which it concluded that Eastman was not disabled from mental illness or fibromyalgia, Prudential stated that Eastman's "diagnosis of fibromyalgia is not associated with an

impairment rating due to lack of objective findings on which to base an

impairment." (AR 143.) Prudential's January 25, 2005, termination letter did not

mention fibromyalgia, instead merely stating that Eastman had exhausted her

"24 months of benefits for her psychiatric illnesses." (AR 128.) In its April 14,

2006, denial of Eastman's second appeal, Prudential dismissed the disabling

nature of her fibromyalgia condition based on its conclusion that her "physical

exams have been negative for any pathology to the musculoskeletal system;" the

reviewing physician opined that the fibromyalgia diagnosis was based on an

entirely subjective basis; the file review revealed "no evidence of any functional

impairment;" and her "primary diagnosis has been a psychiatric one." (AR 111-

12.) Defendant concluded that "Eastman's complaints related to fibromyalgia are

a secondary issue and she could return to the duties of a regular occupation or

any occupation from a musculoskeletal point of view." (Id. 112.)

Plaintiff argues that Defendant erred in denying her disability claim due to

a lack of objective findings of fibromyalgia, because the results of the trigger-

point tests conducted by Herseth, through his statement that Eastman "does have

complaints of pain in 11 of the 18 sites on concern," (AR 385) and the reports of

two rheumatologists are objective medical evidence of the existence and severity

of her fibromyalgia. She cites to Lessard's September 29, 2003 report stating that

all of her tender points were "3 to 4+ with a positive jump sign," and that

fibromyalgia "is undoubtedly the cause of her current aches and pains, probably caused by if not aggravated by [depression, anxiety, and panic attacks]," and to Hatch's December 6, 2005 report that states that "[f]ibromyalgia is clearly present, but the majority of her aches and pains that really bother her are not due to fibromyalgia."  (AR 462, 257).  See Chronister v. Baptist Health, 442 F.3d 648, 656 (8th Cir. 2006) (holding that "eighteen point 'trigger test' . . . qualifies as a clinical examination standardly accepted in the practice of medicine," and that "trigger-point test findings consistent with fibromyalgia constitute objective evidence of the disease") (citations omitted).

Prudential asserts that it had no reason to mention Eastman's fibromyalgia in its termination of benefits letter that was effective January 25, 2005, because her LTD claim had only been approved on the basis of disability from a mental illness.  (AR 136-37.)  Although Prudential asserts that Eastman's appeal of the October 2003 termination of benefits was based solely on her mental illnesses, the Court notes that she did assert that she was unable to work "because of the combination of her depression/anxiety and fibromyalgia," and also argued that the trigger point test constituted objective evidence of her impairment by fibromyalgia.  (AR 810-15.)  However, the appeal did focus on Eastman's impairment due to mental illness, for example, noting that Herseth had opined that "this lady has major depression with anxiety and she has fibromyalgia,

which is maybe secondary; the **depression is definitely overwhelming**." (AR 813 (emphasis added in appeal letter).)   Prudential reinstated Eastman's benefits based on the opinion of Gerson, a psychiatric specialist, who opined that Eastman was fully and possibly indefinitely impaired from her regular occupation due to her psychiatric conditions.  (AR 70, 136-37, 702-21.)

Prudential asserts that it accepted that Eastman had fibromyalgia  (AR 112, 120), but it required objective evidence of the disabling quality of or impairment due to her fibromyalgia.  (AR 41, 67, 74.)  Prudential notes that several of her physicians, including Randall and King, attribute her pain to her psychiatric conditions and diagnosed her with somatoform pain disorder.  (AR 425 (King's March 24, 2003 diagnosis of "307.80 Chronic pain with associated psychological and physiological factors"), 429 (same), 462-63 (Lessard's September 29, 2003 impression of fibromyalgia "probably caused by if not aggravated by [depression, anxiety, and panic attacks]"), 800-09 (Randall's December 12, 2002 assessment of "[p]sychological facts affecting physical function (skeletal muscle headache and skeletal muscle pain)").)

Eastman is correct that the results of her trigger-point test constitute objective evidence of a diagnosis of fibromyalgia.  Furthermore, it may be unreasonable for an insurer to require that medical opinions of impairment or disability be based on evidence more "objective" than a trigger-point test and the

claimant's reports of pain.  However, this is not a case in which Prudential

rejected the opinions of Eastman's medical providers that she was disabled due

to fibromyalgia because their opinions were not based on objective medical

evidence.  Rather, there is no evidence in the record that Eastman was disabled or

subject to particular limitations due to her fibromyalgia.  Herseth, who conducted

the trigger point test, stated that although he believed she was disabled due to

mental illness he was unable to make a determination of her disability based on

fibromyalgia.  (AR 385-86.)  Eastman cites to no restrictions from her medical

providers restricting her ability to work based on her diagnosis of fibromyalgia;

nor does she provide evidence that any of them found her disabled as a result of

her fibromyalgia.  In such a case, Prudential did not commit a serious procedural

irregularity by requiring objective evidence of the disabling nature of Eastman's

fibromyalgia.  See, e.g., Johnson v. Metro. Life Ins. Co., 437 F.3d 809, 814 (8th Cir.

2006) (holding plan can require objective evidence that fibromyalgia "was so

significant or severe that it would preclude [claimant] from performing her job");

Pralutsky v. Metro. Life Ins. Co., 435 F.3d 833, 840 (8th Cir. 2006) (upholding

plan's denial of benefits to claimant with fibromyalgia, when "[g]iven th[e]

potential for varying impact of the condition among different patients, [plan] was

requesting objective information to verify that this claimant, whom it

acknowledged was afflicted with fibromyalgia, was disabled to the point that she

could not perform even sedentary or light-duty work"); <u>Boardman v. Prudential</u>

<u>Ins. Co. of Am.</u>, 337 F.3d 9, 15 n.5 (1st Cir. 2003) (holding that, although it is

unreasonable to require objective medical evidence to establish existence of

chronic fatigue syndrome and fibromyalgia, it was not unreasonable for insurer

to accept diagnosis but require "objective evidence that these illnesses rendered

her unable to work [because] [w]hile the diagnoses of chronic fatigue syndrome

and fibromyalgia may not lend themselves to objective clinical findings, the

physical limitations imposed by the symptoms of such illnesses do lend

themselves to objective analysis"), <u>cited with approval in</u> <u>Pralutsky</u>, 435 F.3d at

841.

> ii.     **Whether Prudential Considered Eastman's Pain Allegations**

Eastman asserts that Prudential committed a serious procedural

irregularity by ignoring her subjective complaints of pain.  She cites to

Prudential's August 31, 2005 denial letter, in which it stated, "Review of Ms.

Eastman's medical records indicates that she reported pain in her shoulders,

elbows and hips and as a result was diagnosed with fibromyalgia by Dr. Herseth

(primary care physician).  Ms. Eastman's treating physicians have attributed her

complaints of pain to her fibromyalgia diagnosis, however there is no mention of

any abnormal physical findings, limited motion or an inability to function on a

physical basis. . . .  The documentation in file does not support an impairment

that would prevent Ms. Eastman from performing her regular occupation with

any restrictions."  (AR 119-20.)

Eastman notes that, while a plan administrator can make credibility

determinations regarding a claimant's subjective reports of pain, it cannot "deny

benefits simply because the only evidence of a disabling condition is subjective

evidence."  <u>Collins v. Cont'l Cas. Co.</u>, 87 Fed. Appx. 605, 607 (8th Cir.2004)

(unpublished) (citation omitted).

In this case, Prudential did address Eastman's complaints of pain and

acknowledged her diagnosis of fibromyalgia.  However, consistent with the

Policy, Prudential required Eastman to provide proof of the extent of her

disability.  Eastman did not provide evidence from any medical provider that she

was unable to work due to fibromyalgia, as opposed to her mental illnesses.  As

the Court concluded in the previous section, consistent with the Eighth Circuit

opinions in <u>Johnson</u> and <u>Pralutsky</u>, Prudential did not commit a serious

procedural irregularity by requiring such proof.

   **iii.** **Whether Prudential Considered All Evidence**
     **Provided by Eastman Before Issuing a Final**
     **Decision to Deny LTD Benefits**

Eastman contends that Prudential refused to consider various medical

records and opinions, specifically the opinion of Hatch.

On December 6, 2005, Hatch diagnosed Eastman with fatigue due to nonrestorative sleep; bilateral trochanteric bursitis; bilateral plantar fasciitis (leading to an altered gait); myofascial pain in her upper back and neck probably due to posture problems; and fibromyalgia.  (AR 257.)  He went on to opine that "the majority of her aches and pains that really bother her are not due to fibromyalgia."  (Id.)  In Prudential's April 14, 2006 letter denying Eastman's second appeal, Prudential stated that "Eastman would not be eligible for benefit payments for any subsequent medical conditions, including the conditions noted by Dr. Hatch as of February 2006, as her coverage under the policy had lapsed."  (AR 112.)  Despite Prudential's statement, it did provide a one-paragraph recitation of Hatch's medical treatment and noted that Hatch's records "concluded an impairment that would prevent Ms. Eastman from returning to work was not documented."  (Id. 111.)  Plaintiff claims that Defendant both mischaracterized this medical evidence and refused to consider it.

The Court concludes that Prudential did consider Hatch's opinion, as it stated in April 14, 2006 letter.  Additionally, Hatch's records were submitted to Campbell, who reviewed them before rendering her final opinion.  (Id. 179 (discussing Hatch medical records).)  Prudential's statement that, to the extent Hatch's examination revealed "subsequent medical conditions," coverage ended before there was evidence that these conditions existed does not amount to

ignoring the evidence submitted by Eastman.  Moreover, Hatch did not opine

that Eastman was disabled based on conditions other than mental illness and

opined that Eastman "should be able to correct the above problems as

suggested."  (Id. 258.)

Prudential did consider the evidence regarding Hatch, and the reports of

its reviewers and its denial letters reveal that it considered the other evidence that

Eastman provided.  The Court concludes that Prudential did not commit a

serious procedural irregularity by failing to consider all of the evidence provided

by Eastman.

> **iv..     Whether Prudential Committed a Serious**
> **Procedural Irregularity by Failing to Obtain an**
> **Independent Medical Examination or a**
> **Functional Capacity Evaluation**

Finally, Plaintiff claims that Defendant erred procedurally by failing to

obtain an independent medical examination ("IME") and a functional capacity

examination ("FCE").  See Payzant v. UNUM Life Ins. Co. of Am., 402 F. Supp. 2d

1053, 1062 (D. Minn. 2005) (holding insurer committed serious procedural

irregularity by failing to obtain IME or FCE for claimant with fibromyalgia when

insurer failed to speak with claimant's primary care provider, who opined

claimant was "unable to work" and "two primary doctors opined about the need

for a functional evaluation").  She argues that despite opinions by Herseth,

Lessard, and Hatch confirming the diagnosis and severity of Eastman's

fibromyalgia, Prudential merely relied on Shavell's file review of Eastman's

medical records.  Eastman notes that, in Herseth's May 13, 2005 letter to

Eastman's attorney, Herseth stated, "It would be my feeling that if you[] were

going to try to make a decision whether the fibromyalgia was physically limiting

her at this point, it might be wise to have functional capacities assessment done

as that is certainly a much better assessment of physical disability.  I do not feel

that I could make a determination of her disability based on physical findings

alone."  (AR 386.)  Eastman asserts that, as in <u>Payzant</u>, this "statement was made

in the context of documenting [Eastman's] inability to work" as opposed to in the

context of determining whether Eastman was disabled.  <u>See</u> <u>Payzant</u>, at 1063.

Prudential had three independent experts review Eastman's claim – a

psychiatrist, a rheumatologist, and a physical medicine and rehabilitation

specialist –, each of whom reviewed Eastman's entire file, as it existed at the time

of his or her review, and Gerson contacted two of Eastman's treating physicians.

Given that not one of Plaintiff's physicians opined that she was disabled as

a result of fibromyalgia, as opposed to psychiatric conditions, Prudential did not

commit a serious procedural irregularity by failing to obtain an IME or FCE when

it reviewed her medical file and involved two independent specialists in the

review process.  <u>Cf.</u> <u>Clapp v. Citibank, N.A. Disability Plan (501)</u>, 262 F.3d 820,

828 (8th Cir. 2001) (holding no serious procedural irregularity when insurer

failed to have rheumatologist or cardiologist review claim of cardiac impairment

and fibromyalgia when there was evidence from primary care physician and

treating cardiologist that claimant was not disabled, insurer spoke directly to

treating doctors, and insurer tracked medical history for two years); Heaser v.

Toro Co., 247 F.3d 826, 833 (8th Cir. 2001) (holding no procedural irregularity

when insurer did not order IME when insurer reviewed claimant's medical

records, contacted one of claimant's treating physicians, and ordered a review by

a medical consultant specializing in the appropriate field).

The Court concludes that Prudential did not commit any serious

procedural irregularity in its handling of Eastman's claim.  Therefore, the Court

will review Prudential's decision under the abuse-of-discretion standard.

### C.   Propriety of Prudential's Denial of Benefits

#### 1.   Interpretation of Policy Language

The mental disability limitation provides: "Disabilities which, as

determined by Prudential, are due in whole or part to *mental illness* have a

limited pay period [of 24 months] during your lifetime."

Prudential appears to argue that the mental illness limitation means that,

no matter how disabling a claimant's physical disability is, if a mental illness also

contributes to her disability, the 24-month limitation applies.  Prudential also

argues, however, that even if the Policy language were interpreted to require

that, in order for the limitation to apply, the mental illness must be the but-for

cause of the claimant's disability, it reviewed Eastman's claim under this

standard and she was still subject to the mental illness limitation.  From the

Court's review of the record, it is apparent that Prudential reviewed Eastman's

claim to determine whether, independent of her mental illness, she was still

disabled.

The term "are due" is capable of a range of meanings, "ranging from sole

and proximate cause at one end of the spectrum to contributing cause at the

other."  Kimber v. Thiokol Corp., 196 F.3d 1092, 1100 (10th Cir. 1999)

(interpreting term "due to").  ("A 'contributing cause' means [the condition] was

a necessary, though not necessarily sufficient, cause of the . . . disability."  Old

Ben Coal Co. v. Dir., Office of Workers' Comp. Programs, U.S. Dept. of Labor, 62

F.3d 1003, 1008 (7th Cir. 1995) (citation omitted).)  "When a plan administrator is

given authority to interpret the plan language, and more than one interpretation

is rational, the administrator can choose any rational alternative."  Kimber, 196

F.3d at 1100 (citation omitted).  Thus, Prudential has the discretion to choose any

rational interpretation of the mental illness limitation, within the range noted.

The Court concludes that Prudential's first proffered interpretation of the

limitation, that the limitation applies if a mental illness is in any way disabling,

even if the physical illness is also independently disabling, is patently

unreasonable.  Under Prudential's reading, no matter how physically disabled a

claimant is, she cannot obtain benefits beyond 24 months if she also has a mental

impairment that in some way, no matter how slight, also contributes to her

disability.  Thus, given two claimants who are equally physically disabled, if the

first claimant has no mental disability but the second claimant has, in addition to

her complete physical disability, disabling depression, under Prudential's

interpretation, the first claimant would receive lifetime benefits but the second

claimant, who is even more disabled than the first, would lose benefits after 24

months.  This interpretation eviscerates the meaning of "are due," even when

read in conjunction with the phrase "in whole or part."  Interpreting the plan

language to punish claimants for having a mental disability in addition to an

independently disabling physical condition is absurd and unconscionable.

The Court concludes any reasonable interpretation of the limitation

requires that, at a minimum, the limitation applies only if without the

contributing mental illness, the claimant's physical condition would not be

independently disabling.  The term "are due" means that the mental illness must

be at least a contributing factor or cause of the claimant's disability.  If the

claimant is disabled even without consideration of the mental illness, then the

mental illness is not a contributing cause of the disability — it is superfluous.  If

the mental illness is a contributing cause of the disability, no matter how slight, such that, without the mental illness, the claimant would not be disabled, then the limitation applies.  This interpretation is the only non-absurd interpretation of the limitation put forth by Prudential.

The Court now must determine whether a reasonable person, based on the evidence before Prudential, could have determined that Eastman was not disabled as a result of her fibromyalgia.  In other words, the Court must decide whether it was an abuse of discretion to decide that, without regard to Eastman's mental illnesses, Eastman was not disabled.

### 2.    Whether Plaintiff Is Disabled Due to Fibromyalgia

#### a.    SSDB Determination

Eastman asserts that her SSDB determination supports a finding that she was disabled by fibromyalgia.  While the ALJ did find that Eastman suffered from fibromyalgia, the ALJ did not find that the fibromyalgia was independently disabling.  The ALJ never discusses the impairment allegedly caused by fibromyalgia.  Instead, the ALJ's discussion of Eastman's impairment focused on Eastman's mental illnesses.  (AR 599.)  For instance, the ALJ noted Herseth's opinion that Eastman's "mental status would not allow the performance of full-time work," and concluded that Eastman "cannot be expected to sustain the mental demands of [full-time] work," and she would need excessive days off

"given the severity of her mental impairments."  (Id.)  In any case, conclusions of the Social Security Administration are not binding on Prudential.  Farfalla v. Mut. of Omaha Ins. Co., 324 F.3d 971, 975 (8th Cir. 2003).

> **b.    Campbell**

Eastman particularly attacks the opinion of consultant Campbell.  Eastman argues that Campbell's opinion is incompetent because she concluded that "[t]he tender point examination for fibromyalgia is considered subjective testing, since it relies on the claimant to give a subjective complaint of pain."  (AR 180.) Eastman notes that Herseth opined that "objective signs/symptoms in Ms. Eastman's case substantiate the diagnosis of fibromyalgia," and, that the Eighth Circuit has held that trigger-point testing is objective evidence of fibromyalgia.

Defendant asserts that Campbell's classifications of Eastman's trigger points as subjective is irrelevant because the mere diagnosis of fibromyalgia does not establish disability.  See Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998) ("It is not enough [in the SSDB context] to show that she had received a diagnosis of fibromyalgia with a date of onset prior to the expiration of the insured period, since fibromyalgia is not always (indeed, not usually) disabling.") (citation omitted).

The Court agrees that Campbell's opinion can be interpreted to improperly dismiss Eastman's diagnosis of fibromyalgia based on the lack of "objective" test

results.  However, Campbell did completely review Eastman's medical file and explained her reasoning for doubting Eastman's credibility.  Morever, in light of the fact that there is no opinion from any medical provider, treating or otherwise, the Eastman was disabled or subject to particular limitations due to her fibromyalgia, the Court cannot say that Campbell's dismissal of Eastman's fibromyalgia diagnosis rendered Prudential's decision an abuse of discretion when Prudential based its termination on the lack of evidence that Eastman's fibromyalgia was disabling.

### c.      Treating Physicians

In this case, the Policy placed the burden of proof on Eastman to establish her eligibility for benefits.  (AR 41-42.)  Eastman must provide written proof that demonstrates "the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation or gainful occupation." (Id. 41.)  The parties agree that Eastman is disabled and that Eastman has been diagnosed with fibromyalgia.  However, the record contains no evidence regarding the extent of Eastman's impairment caused by fibromyalgia and no opinion by any medical provider that Eastman was disabled by fibromyalgia. See, e.g., Pralutsky v. Metro. Life Ins. Co., 435 F.3d 833, 840-41 (8th Cir. 2006) (upholding plan's denial of benefits to claimant with fibromyalgia, when "[g]iven th[e] potential for varying impact of the condition among different patients,

37

[plan] was requesting objective information to verify that this claimant, whom it

acknowledged was afflicted with fibromyalgia, was disabled to the point that she

could not perform even sedentary or light-duty work"). Instead, the record is

replete with opinions by Eastman's treating physicians, and by consulting

physicians, that Eastman's mental illnesses caused her disability.

Eastman's treating physicians provide support for Prudential's

determination. None of Eastman's treating physicians rendered a clear opinion

that her fibromyalgia was disabling. For instance, on December 8, 2004, Herseth

opined that Eastman could not return to work as a result of her "mental

function" due to severe major depression. (AR 663.) King opined that Eastman

was disabled as a result of depression and related psychiatric impairment. (Id.

724, 726.) She also opined that Eastman suffered from a pain disorder with

psychological and physiological factors. (Id. 425, 429.) Lessard opined that

Eastman's depression and anxiety caused her fibromyalgia symptoms. (AR 462-

63) Hatch opined that thw majority of Eastman's aches and pains were not

attributable to fibromyalgia and that Eastman "should be able to correct the . . .

problems as suggested." (AR 257-58.) Additionally, as Prudential notes, even if

Eastman's psychological conditions were of physical origin, the manifestation

and symptoms of an illness trigger the applicability of the mental illness benefit

limitation. Stauch v. Unisys Corp., 24 F.3d 1054, 1056 (8th Cir. 1994); Brewer v.

Lincoln Nat'l Life Ins. Co., 921 F.2d 150, 154 (8th Cir. 1990).

Eastman relies heavily on the opinion of Herseth.  Eastman notes that, on March 6, 2003, Herseth opined that "the component of fibromyalgia in this lady is a big factor; it seems to really be disabling her," and that on May 13, 2005, Herseth stated: "Severe pain is certainly the most common symptom [] of fibromyalgia, and I do contribute [Eastman's] symptoms of pain of fibromyalgia. I do not see that as a symptom of depression."  She admits that he attributed her fatigue "more to depression than to fibromyalgia," but argues that he admits her fibromyalgia also contributes to both her pain and fatigue: "Eastman's complaints of disabling pain and fatigue traceable to her fibromyalgia condition [are] credible and based on medical evidence."

Herseth clearly did regard Eastman as disabled, opining, "I do feel, regardless of the c[ause] and effect on relationship between fibromyalgia and depression, that she is incapable of anything other than intermittent 'as tolerate[d]' employment."  However, Herseth also was clear in his statement that he could not make a determination that she was disabled based on her physical ailments alone.

### d.    Reviewing Physicians

Additionally, three independent specialists reviewed Eastman's file; none opined that she was disabled due to fibromyalgia; and two specifically opined

that she was not disabled due to fibromyalgia.  Even if Herseth's opinion were

interpreted to support Eastman's claim, Prudential was entitled to rely on the

opinions of the reviewing physicians, particularly in light of the opinions of

treating physicians Hatch, Lessard, and King:

> Where there is a conflict of opinion between a claimant's treating
> physicians and the plan administrator's reviewing physicians, the
> plan administrator has discretion to find that the employee is not
> disabled unless the administrative decision lacks support in the
> record, or . . . the evidence in support of the decision does not ring
> true and is . . . overwhelmed by contrary evidence.

Coker v. Metro. Life Ins. Co., 281 F.3d 793, 799 (8th Cir. 2002) (citation omitted).

See also Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003)

("[C]ourts have no warrant to require administrators [of ERISA plans]

automatically to accord special weight to the opinions of a claimant's physician;

nor may courts impose on plan administrators a discrete burden of explanation

when they credit reliable evidence that conflicts with a treating physician's

evaluation.") (footnote omitted).

### e.    Conclusion

Although the Court may not agree with Prudential's decision that Eastman

was not disabled due to fibromyalgia, Prudential's determination that Eastman

was subject to the 24-month mental illness limitation was not an abuse of

discretion.  A reasonable person, given the evidence in the record, could have

reached a similar decision.  Therefore, Prudential is entitled to summary

judgment on Eastman's ERISA claim.

###### D.     Defendant's Counterclaim for Recovery of SSDB

Under the Policy, certain "deductible sources of income" must be

subtracted from a claimant's LTD benefits.  (AR 31.)  These sources of income

include disability payment under the Social Security Act.  (<u>Id.</u>)  Defendant paid

Plaintiff the full amount of her gross LTD benefits from January 2003 through

January 2005.  Plaintiff, however, was awarded SSDB retroactive to January 2003

in the amount of $1,393 per month.  (<u>Id.</u> 579.)  Eastman has not yet reimbursed

Defendant for the overpaid benefits, despite the applicable Policy provision and a

signed Reimbursement Agreement that required her to do so.

Defendant asks for summary judgment on its breach of contract claim in

the amount of $27,189.68.  Eastman concedes that, if Prudential's motion for

summary judgment is granted, an overpayment has been made; however, she

objects to the amount of damages to which Prudential is entitled.  Plaintiff argues

that Prudential has failed to meet its burden of proof as to the amount of

overpayment because it provides no citation to the administrative record to

explain how it calculated an overpayment of $27,189.68.  In fact, the record does

reflect both Eastman's Social Security award and Prudential's method of

calculation.  (<u>See</u> AR 76-77, 81-87, 103-06, 164-71, 579-81.)  Eastman has pointed to

no genuine issue of material fact with regard to the amount of overpayment that she owes Prudential.  Therefore, the Court grants summary judgment for Prudential on its claim for $27,189.68.

Prudential also requests an award of attorney fees and prejudgment interest, but presents no argument explaining why it is entitled to attorney fees or prejudgment interest.  Therefore, if Prudential seeks such an award, it must submit a memorandum to the Court within 30 days of the date of this Order explaining why it is so entitled.  Eastman shall have 30 days from the date of the filing of Prudential's to submit a brief in opposition.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.    Defendant's Motion to Strike Portions of Plaintiff's Reply Brief in Support of Her Motion for Summary Judgment or, Alternatively, for Leave to File a Sur-Reply [Docket No. 48] is **GRANTED** as follows: Prudential is granted permission to file its proposed sur-reply [Docket No. 54].

2.    Defendant's Motion for Summary Judgment [Docket No. 29] is **GRANTED** and Defendant is awarded judgment in the amount of $27,189.68.

3.    If Prudential seeks an award of attorney fees or prejudgment interest, it must submit a motion and memorandum to the Court within 30 days of the date of this Order explaining why it is so entitled.  Eastman shall have 30 days from the date of the filing of Prudential's to submit a brief in opposition.

4.     Plaintiff's Motion for Summary Judgment [Docket No. 25] is
       **DENIED**.


       **LET JUDGMENT BE ENTERED ACCORDINGLY.**



Dated:   January 29, 2008                    s / Michael J. Davis
                                             Judge Michael J. Davis
                                             United States District Court